and Magyar, an ambassador tech, ZRT, MAV, ZRT. Mr. Gaskin for the appellants, Mr. Silbert for the applicants. May it please the court, I'm Paul Gaskin appearing for plaintiff's appellants. With me at council table are David Weinstein and Mark Zell from Jerusalem. And we are especially honored to also have attending today Rosalie Simon, one of our named plaintiffs, and her daughter Ruth Simon, a member of the New York and New Jersey Bars. There are two issues presented to the court on appeal today. One is whether prudential exhaustion requires that survivors return to Hungary to seek relief there in the first instance, and the other is whether this case was properly dismissed on grounds of forum nonconvenience. We have argued in our briefs that the first doctrine is not applicable and unsupported, and that the second doctrine, FMC, was both misconstrued and misapplied. FMC allows dismissal in favor of a foreign forum only in exceptional circumstances and only where defendant challenging plaintiff's chosen forum meets its heavy burden of showing that the foreign forum is the strongly preferred forum for the litigation. Prudential exhaustion is not required by international law. Can we actually stay on the forum nonconvenience for a second here? Tell me a little bit about, I'm trying to understand here, what did the district court know about, if anything, about what type of proof was going to be expected in this case? Was this going to be both on the plaintiff's side and, if you know, on the defendant's side? If not, they can answer that question. I'm not talking about laying out your pretrial list of exhibits or witnesses, but at least for your purposes, the purposes of your side of the case. Was it expected to be witness testimony, record heavy? Were lots of people in Hungary going to need to be called as witnesses to prove your case? No, I don't believe any people from Hungary will be called to prove our case. Our case will be proved by the testimony of plaintiffs themselves, four of whom of the named plaintiffs are United States residents. And it will also be proven by reference to some documents, many of which are found here right across the mall in the Holocaust Memorial Museum. And frankly, as far as liability goes, Your Honor, I don't think this is a difficult case to prove. The opinion of this Court on the Simon Appeal already set out the historical background in great detail. And to the extent that there will be any need for testimony from Hungary, I imagine it will be largely historical expert witness testimony. And expert witnesses, as we know, could come from anywhere.  Mr. Gasson, what about the law, choice of law? The claim, as we described it in Simon 1, is a common law claim. And then it has an international law jurisdictional basis. But the claim itself is a common law claim? So is that common law of Hungary or historical Hungarian law or American law? Where would a court adjudicating that look? We believe there is a well-established body of law applicable to takings generally. And what we would say is that general principles of international law will apply because those general principles of international law often apply in cases of takings of property. And there is no reason, obviously that's a fine point that will have to be hashed out in briefing about conflicts of law, but we will propose and we will advocate for the applicability of general principles of international law. Do you have any support for that, any case support? I realize this is a very unusual type of thing. Well, we do, Your Honor. I mean, there are many expropriation cases heard in international tribunals, and I'm not saying this is exactly that case, but there are many cases such as that from which these general principles of international law can be derived and which have been applied in such cases. And you're not talking about treaty-based decisions? You're talking about? I'm talking about cases like the Horchow factory case, various cases like that, which have always been held out as applying general principles of international law which call for full, fair, and adequate compensation in the case of takings jurisprudence. But the merits claims as described in Simon 1 were perfectly ordinary humdrum tort claims, right? Conversion, unjust enrichment, right? Had nothing to do with genocide and all of the difficult, all of those difficult aspects of the case. So is there any support for the proposition that there's some free-floating, international common law claim for conversion or unjust enrichment? No, I'm not claiming that, Your Honor. I'm claiming that because of the unique takings at issue here, the genocidal expropriation, that these claims can be subject to what I would call principles derived from international law. I'm not saying they're subject to international law, but that they are subject to principles derived from international law and those principles clearly call for full, fair, and adequate compensation in these circumstances. If in the end we lose that argument... Is your theory that Hungary would have, at the time of these events, been subject to these derived-from-international-law rules? Or that Hungary itself had in place, at the time, at least for non-Jewish people, laws about, against these types of expropriations? I'm just trying to understand whether it's essentially Hungarian common law that was supposed to be consistent with international law at the time? I can't answer that, Your Honor, as to what the Hungarian law in the 1940s would have said. I can say that Hungarian defendants have claimed in this case and have submitted a declaration of an expert witness which says that Hungary recognizes international law and considers international law to be part of their law. Their own expert witness, Dr. Sanovan, submitted a declaration to that effect. Whether that was also the case in the 1940s, I'm just not sure, Your Honor. And you wanted to talk about the exhaustion doctrine as well? Excuse me? You wanted to talk about the exhaustion, the prudential exhaustion point as well? I'm sorry, I'm having a hard time... You wanted to talk about prudential exhaustion as well. Prudential exhaustion, of course. I belayed you onto it. No, of course, I'm sorry, Your Honor. I misunderstood what you were saying. Our position is that it's not required by international law, not required by international comedy, contrary to the purposes and intent of Congress in enacting the comprehensive framework of the FSIA and contrary to the unflagging obligation of the federal courts to exercise their jurisdiction when they have it. The NML securities case is an important case recently decided by the Supreme Court and it traced the history and purposes of the FSIA in some detail. As set forth there, the FSIA was intended to replace the ad hoc case-by-case decision-making concerning immunity that existed prior to its enactment and it replaced it with a comprehensive and consistent set of rules for when a foreign sovereign could be sued in the United States and when it couldn't. Concerning immunity, but not exhaustion. Those doctrines are different. Absolutely, Your Honor, but what we're saying is the only basis that either this court or the Seventh Circuit ever looked to for trying to invoke this exhaustion doctrine, and it is unprecedented and no other court has ever endorsed it, the only basis that this court or the Seventh Circuit ever looked to were considerations of international comity. And what we're saying is international comity was really the basis for immunity originally and it is the underlying principle informing the FSIA. It is part of the underlying purpose, the reason why the FSIA was enacted. We have two Supreme Court cases that in fact both sides cite, Pimentel and Berlinden, both saying that foreign sovereign immunity is a matter of grace and comity. Mr. Justice Scalia set this out very clearly that if there is an interest toward comity or toward immunity expressed, it must be in the act. If there isn't, that's the end of the consideration. What we are really saying is that these considerations of international comity are baked in the cake of the FSIA. Any requirement to impose additional comity considerations on the courts, even after they have fully considered and applied the FSIA, undermines the comprehensive structure that Congress enacted and invites a return to precisely the same sort of ad hoc approach that enactment of the FSIA was intended to cure. Is this purely then, in your view, a statutory interpretation determination? Not purely, Your Honor. It ultimately comes down to that, yes, Your Honor. But we understand the argument that the other side makes and we understand the argument that the Seventh Circuit makes in its holding that there are these free-floating comity considerations that somehow go beyond what was incorporated into the FSIA, but we believe that that is an invalid and wrong argument because ultimately comity is the principle that underlines the affording of immunity from one state to another. I guess my concern is that the United States, there's sort of almost a separation of powers question there for us as a court. Should we get the views of the United States on this question? Does Congress have the authority to sort of package and exhaust the comity interests that typically we associate with the executive and push the executive out of the equation? Or what if the executive thinks otherwise? Well, precisely, Your Honor, that is the purpose of the Foreign Sovereign Immunities Act. As the NML v. Argentina case held in some detail, you can go through step by step every single interest and it's all resolved in the FSIA. What we are really saying about comity, Your Honor, is that whatever considerations of comity apply, they're already baked in the cake of the FSIA. Unless there was a background rule and tradition of exhaustion, right? Suppose there were, and I know you dispute this, but to me this case comes down to the question whether there was a background rule or practice of exhaustion, whether based on international law or comity. If that were true, I don't know why we would read the FSIA as kind of superseding that background doctrine any more than we would read it as superseding the background doctrine of foreign nonconvenience. Well, a couple of things, Your Honor. First of all, the doctrine of foreign nonconvenience was expressly acknowledged and recognized in the legislative history of the FSIA. Nothing related to prudential exhaustion was. In fact, where the framers of the FSIA wanted to include an exhaustion requirement, they knew how to do it and they put it in there. In the terrorism exception, there is a requirement to arbitrate any terrorist attacks that occur in the territory of the defendants. To arbitrate. Excuse me? To arbitrate. To arbitrate. Which is a little bit different from the local remedies rule which would send the plaintiff to the domestic courts of the offending country. It is a little different, but the arbitration might have to take place in the offending country's territory. At any rate, Your Honor, it is similar to the exhaustion requirement and they knew how to put it in there when they needed to. To get back to your underlying point, there is no background requirement ever for these kinds of claims. The only of prudential exhaustion. Let's just pursue that a little bit. You said earlier that you anticipate you will try to make out your underlying merits claims in international law terms rather than under Hungarian common law. It seems to me that cuts against you on prudential exhaustion because then you have an individual plaintiff seeking to pursue claims against a sovereign government under international law. That sounds a lot like circumstances in which the local remedies rule applies and tells the plaintiff, before you make an international incident out of something, at least go to the home courts and see what you can do. That would clearly be true if the United States were espousing these claims. Why shouldn't it be true when the aggrieved victims are bringing the claims directly? Your Honor, if I said that, I misspoke slightly. I thought I said and I hope I said general principles derived from international law. It's either international law or it's Hungarian common law. It's got to be one or the other. Or potentially federal common law. That's another possibility. U.S. federal common law? Yes. Applied extraterritorially to stuff that happened in Hungary? Your Honor, there's a treaty that is expressly applicable to these kinds of claims. So, yes, I think an argument could be made. Once again, we're getting way ahead of ourselves on what law should apply. I posited one possibility, Your Honor. Go ahead. Let's just focus on the possibility that your merits claims will arise from international law. And I understand you might have theories. You might have other theories. But just as to that piece of it, that seems pretty close to a lot of situations in which a local remedies rule would apply. I disagree, Your Honor. Let me tell you why. International law, properly so-called, is public international law, which governs the relationship between states. The local remedies rule, the exhaustion rule, only applies in two situations under international law, where the United States might espouse or a nation might espouse the claims of one of its claimants, or if you're going to an international tribunal. It has never been applied. Let's take your number one. Some of these plaintiffs are now United States citizens. And I assume the United States, if it chose, could espouse their claims. And that would configure the case of United States espousing the claim of these plaintiffs versus Hungary. But that's a very different legal regime. It's the same underlying claim. It's the identical underlying claims, and they would be subject to the local remedies rule. And I'm not sure why exhaustion should come out differently based on whether it's Mrs. Simon against Hungary or the United States on behalf of Mrs. Simon versus Hungary. What's the relevant difference for exhaustion purposes? The relevant difference is comedy considerations come into play when you have a nation-to-nation kind of contest or a nation-to-nation litigation or a nation-to-nation claim. And effectively, when you have espoused the claim, one of your plaintiffs, you are saying we, the United States, are making this claim against Hungary. You're not saying the plaintiff is anymore making the claim. That is a proper subject of international law, and the exhaustion rule has been held to apply in such cases. However, under the foreign sovereign... I would think you could make an equally compelling argument. You might think comedy concerns are worse when a state has to go against not another sovereign that's co-equal on the international plane, but just a single individual citizen of a foreign sovereign. That might be a greater affront. But that is exactly why the Foreign Sovereign Immunities Act was enacted. That is exactly why it is a comprehensive scheme. And that is exactly why, although the default general assumption is that a foreign sovereign will be immune, there are certain exceptions. And all of those comedy concerns are already accommodated within the language and the application of those exceptions. The lower court completely ignored two other decisions of the same court by Judges Huvel and Judges Kolar-Catelli. Holding to that effect, not a single court anywhere has ever suggested that there should be an exhaustion requirement in these circumstances the way the Seventh Circuit did. When you say these circumstances, are you saying that no court apart from the Seventh Circuit has ever resigned plaintiffs in a genocide case to exhausting processes in a genocidal state? I'll go further, Your Honor. No court anywhere has ever applied an exhaustion requirement to an FSIA case, regardless of whether it involved genocide or not. Other than the Seventh Circuit. Other than the Seventh Circuit. How much authority is there the other way? We have the two district courts in our district, but we don't have courts that would give us... These are very recent decisions. I understand. It just seems like it's a case of early impression. One court of appeals has weighed in, and it's gone against you. That's true, Your Honor. And we're hoping that this court of appeals will go the other way. All right. We'll hear from the other side. They might have a different view on that question. Good morning. I'm Greg Silbert from Weill for Hungary. I'll start with four nonconvenience and specifically the issues that you asked my friend, Mr. Gasson, about the evidence in Hungary and the choice of law questions, and then I will turn to exhaustion. First, with respect to evidence, when you think about what Hungarian evidence or witnesses would be presented in this litigation, I think it helps to first look at the kinds of properties that the plaintiff's claim were expropriated. Those properties include bank accounts. They include businesses. They include artworks. They include jewelry. So how would a plaintiff establish in a court of law those kinds of losses? You would look at testimony. Yeah. Well, testimony plus records, Your Honor. They have them. A lot of the records were destroyed as well. I'm sorry. I'm sure their personal records were all destroyed as well. Well, if you had a bank account, there could be bank records. If you had a business, there would be business records. There could be tax records. Do you have a sense of what the defendants in this case, again, I'm not asking for a pretrial conference, but is there a sense of what kind of evidence they would anticipate? What kind of evidence comes on as a defense in a case like this? It's a long time has passed. I don't know how many records will still be available other than in national archives that are partially accessible from any location. I couldn't give you a sense of precise numbers, but here's what the plaintiffs themselves allege about that, and you'll find this at page 155 of the joint appendix. They say that there are voluminous records in Hungary that are vital to their case, and that's what their experts said as well as the district court noted. So I think the plaintiffs have pled themselves out of the argument that there is not going to be relevant or important evidence in Hungary with respect to witnesses. We know that the plaintiffs' counsel here traveled to Hungary for the purpose of examining a witness who they described as a key witness in this case, and that when they did so, the Hungarian court cooperated and assisted them to try to perform their work. All right. So I'm trying to get a sense again of it seems to me this is either going to be documents that are kept by some higher authority than individuals would have had in a case like this, presumably governmental or maybe banking records, which can be acquired in either jurisdiction through subpoenas or letters of orgatory or whatever it is one needs to do for an international dispute. This happens all the time in international commercial disputes. Your Honor, remember too though the scale of this case. This is a worldwide class, and so there would be, when you're talking about subpoenas. There's worldwide bankruptcy actions. These things happen. They happen. It gets done. Courts managed to do this in 2018. They have ways of getting documents across borders. Unless you're telling me that there's an expectation that there would be a long line of Hungarian human witnesses testifying who would not be able to travel, that would be sort of the harder thing on your end, but the documentation thing seems to be not a strong point either way. Fair enough, Your Honor. I think also the documentation would be in Hungarian, so it's not just a matter of getting it here. Well, it has to get translated anyhow for the plaintiffs. A lot of them don't speak Hungarian. Many of them don't speak English. Right, so you're going to have translation issues either way. That seems to be a wash. Okay. I think for the point of this factor is not is it impossible to get the documents. The question is does it point more towards a Hungarian forum or more towards a U.S. forum. I think clearly if it points anywhere, it points to Hungary. Same with choice of law as the questioning brought out. The claims in this case are pure common law claims. They look like claims you would see in a state court. They're like unjust enrichment, conversion. There's something about a fiduciary duty owed by common carriers. What law in your view applies? Hungarian law. Historical Hungarian law? Well, yes. I think it would be probably the law of Hungary that applied at the time of the events with the caveat that Hungary by constitutional amendment has waived any statute of limitations with respect to those claims, so there is some modification there. That's hard to imagine that there was a law at the time in Hungary that would respect any property right of any Jew. Fair enough. Why isn't the plaintiff's counsel correct when he says that we just look to sort of basic law of expropriation that applies in international fora? If there is such a law in international fora, which I don't know, then it would be applicable in the Hungarian courts because as my friend also mentioned and as Dr. Sonnevend, the defense witness testified, international law is enforceable in a Hungarian court. Is this going to be a case where Hungary says we had a right to take, that we had some lawful right to take their property, or is this just going to be a case about what was taken, sort of value damages? Surely this isn't going to be a we can test liability. We have a right to take their property case under Hungarian law or international law. I don't imagine the defense is going to be we had a right to do it. The law is probably going to be that there's no dispute that there was no legal right to do this. It's going to be, I think, as you started, who had what that was taken that needs to be proved. Isn't that where the form of nonconvenience analysis needs to focus? That's part of the analysis. Another part of the analysis is interest. Which jurisdiction has a stronger interest in resolving the controversy? That's front and center in the exhaustion analysis, but it's also a factor in the FNC analysis and the public factor. What gives the government of Hungary a greater interest in having this decided on their turf than the plaintiffs in not having to return to the turf of the people who committed genocide? The government and the governmental processes of the government, that is official policy, committed genocide. Why is that any weightier? Well, Your Honor, let's look at both of the interests. Hungary's interest in resolving the controversy is, one, this was conduct by Hungary against Hungarian nationals on Hungarian soil, events of great historic significance to Hungary and its history. I don't get why you get to cry about your rights when what you did was in violation of international law, basic laws of humanity. I just don't understand why that outweighs the victims in a case like this. This isn't like Pimentel when you had Philippine, where the plaintiffs as well as defendants, and it was about a former Philippine official. This was official Hungarian governmental policy, and it seems a little odd to say we were so outrageously in violation of every law that governs international law and crimes against humanity that we somehow have a right to force those people, the victims, to come back to Hungary and to our governmental system and to submit to our government again. Judge, it was official governmental policy of over 70 years ago. I certainly don't disagree with you that the— Well, there's a certain time when that right kicks in, so five years after the war ended and a new government was set up, we wouldn't make them come back, but somehow 70 years, when they're too frail to travel, we'll make them come back? I think it depends on the facts of each case, and that's exactly the kind of— Do you assume the emotional trauma dissipates over time? I don't know if it does, but I think, again, it's for the district court— Do you assume for these purposes that it doesn't, that you have the burden on foreign nonconvenience? I think the emotional trauma is a real issue, and the district court considered it and balanced it against the other factors. I know, but I'm asking about one of those factors, which she thought Hungary had some weighty claim to controlling where this is litigated, and I haven't seen that factor given this type of weight in a case when it's purely in a defensive posture by a government. They don't have citizens on the plaintiff's side of the case. It's purely in a defensive posture, and they are a government that committed amongst the worst atrocities known in the history of humankind. It just seems quite chutzpah, I guess, to say, you know, we have the greatest interest here, greater than their interest. I mean, that's the only question, greater than the victim's interest in picking their location. So no dispute about, you know, among the worst atrocities of all time, and there are atrocities that every nation, every person on earth can and should condemn. That does not give the United States any unique interest in hosting these claims. We're asking where the plaintiffs chose. Four of the plaintiffs are American, right? Zero plaintiffs are Hungarian. At least zero named plaintiffs are Hungarian. As far as we know, none of the named plaintiffs. Again, you had the burden, so there's no identified plaintiffs that are Hungarian. So four are American, I think two are Canadian. It's a lot more convenient to come here than to go there. Folks in Israel, they've made a judgment that it's more convenient to come here. That's the rest of the plaintiffs. And the Australian, you know, leave it to them to decide where they want to go. But I don't understand why you're saying the U.S. has no interest. There's four Americans. The United States says it has an interest in ensuring compensation for victims of a Holocaust during their lifetimes. And so transferring and starting over again counters that government. That's what the U.S. said in its statement of interest in this case. And it seems to me the FSIA exemption that's at issue here is a statement, by both political branches of the United States in legislation, that they don't want blood money spent in the United States. So that is a pretty powerful U.S. interest, is it not? I don't view just the jurisdictional commercial nexus of the FSIA as itself a U.S. interest that is sufficiently forceful that it could override what we do think is a— I'm doing all these factors together on the plaintiff's side. Because the district court said, yeah, yeah, emotional trauma, but then labeled it— she gave the plaintiff's minimal deference. Not on emotional trauma, on the mere fact that there's— Overall, their interest, after acknowledging the emotional trauma, said it all adds up and gets minimal deference in a case like this. I'm sorry, go ahead. No, no, you go ahead. You can answer. I think what the district court said is that the plaintiff's choice of home form deserves less deference here because there is less of a connection to the United States. But that, in fact, is what plaintiffs on cases say, like Carjano. Plaintiffs cite Carjano in Ninth Circuit case for the proposition that, well, if you have at least one U.S. plaintiff and other foreign plaintiffs, doesn't mean that the U.S. plaintiff's choice of form gets less deference. If you continue reading that decision, what it says is, well, it can mean that there's reduced deference if there are reasons to think that the choice of the U.S. form is not based on factors of convenience or connection to the form, but in that case, there was a U.S. defendant and a strong connection. No, but in this case, there's plenty of reasons to understand why they don't want to be in Hungary. These are case-specific determinations, and the question for now, no one's thrown out door number three, is U.S. or Hungary. And we could sit here for quite some time while we give a list as to why they don't want to go to Hungary for this case and why that's a very powerful interest to be respected. And then I was just responding when you say there's no U.S. interest, and I think the district court said the same thing, and that just strikes me as wrong, when you've got four plaintiffs, right, but a third of the plaintiffs are Americans. You've got a statement by the United States government in this case that says it wants expeditious relief for victims of Nazi-era genocide and genocidal practices, which won't happen if it's transferred. And you've got a statute that says we don't want that money spent on that type of money, assuming the outcome of this case, for these present purposes, we don't want it spent on our turf. That seems like a powerful interest. Maybe that's the statute I think you're referring to as the FSIA, so maybe that's a good segue to the exhaustion question. I think what the FSIA is saying is here – remember, the FSIA is codifying the so-called restrictive theory of sovereign immunity. And so it's saying, look, for acts that are considered public acts, you are immune. Okay? The U.S. courts cannot touch you, foreign sovereign. For acts that are non-public or so-called commercial or private, then there may be jurisdiction. And so that line that the FSIA is drawing is – and where it takes account of comedy for that purpose, the immunity purpose, is what can we look at as on the jurisdictional side of the line somehow commercial or private? What can we look at on the immunity side of the line as a public act that is beyond the reach of the United States courts? But nothing in the FSIA says, hey, you Article III judges, every time – you must go right up to that line every time and exercise jurisdiction in every case. We're not going up to any line. The political branches made the judgment when they wrote the FSIA. They included their judgments on both international law and comedy. That's what the Supreme Court has told us anyhow, that the statutory judgments reflected those principles. And so it seems to me as the branch least qualified to opine on matters of international law and international relations, it seems to me our job is to follow their direction and trust their judgments rather than superimposing our own judgments. Isn't that right? No, Your Honor, it isn't. They made a judgment about a different question that is not before you today. They made a judgment about where a foreign sovereign is completely immune from jurisdiction and where jurisdiction would be available. The question before you, which is one the courts are institutionally competent to answer, is when is there a comedy interest for the courts of the United States to decline jurisdiction even when they have it? And that is something that the courts regularly do without specific instructions from the political branches in many cases. I'm sorry. It's what the United States Supreme Court did with respect to tribal exhaustion in Lapland. It looked at comedy. It's what a number of different federal courts do based on international comedy concerns in other circumstances. But when it comes to dealing with foreign governments, foreign sovereigns, when it comes to dealing with foreign sovereigns, we follow the political branches' lead. That's the safest course for the courts, is it not? Yes, Your Honor, but when the court is asked to exercise jurisdiction over a foreign sovereign or in a case that would predictably create friction with a foreign sovereign, it can take account of those comedy concerns. The Supreme Court did so. So we can say, I mean, I guess there's a question. I think you're assuming that plaintiffs are asking us to take jurisdiction. I think my questions are assuming Congress is telling us to take jurisdiction when plaintiffs ask. Congress is telling you whether you have jurisdiction. It's not telling you that in every case you must exercise it. But it seems like there's a bit of a double counting in the sense that under, as Justice Breyer's opinion recognized in Altman. Altman, thank you. In order to show an expropriation in violation of international law, which is what's required to even be actionable under the Foreign Sovereignty Act, one typically would have to show that they had exhausted, in this case, Hungarian remedies. But because this is a genocidal expropriation, that exhaustion requirement falls away, right? And so it seems to me like you're kind of doing a double counting and saying, like, yeah, the exhaustion such as it is is encompassed within the FSIA, except where it's not, as here, and then we're going to graft it on top. And that just seems to me like fighting against Simon 1. That basically that's a done deal. If this is an expropriation in violation of international law, then the next question is foreign non-convenience, and there's no additional comedy exhaustion requirement. I don't think it is fighting against Simon 1 for two reasons. Judge Pillard, first of all, remember that Judge Srinivasan, the Simon 1 panel itself in that decision recognized that the district court should decide on remand whether exhaustion based specifically on international comedy should be applied in this case. So if that panel understood its decision to preclude comedy-based exhaustion, its remand instruction would make no sense. Number two, the exhaustion that you're talking about, the exhaustion under international law for a takings requirement is a mandatory jurisdictional kind of exhaustion, right? That's not the kind that's before you today. The kind of exhaustion that's before you today is a discretionary comedy-based non-jurisdictional exhaustion that applies based on the facts of a particular case, not in every case. It's not even really exhaustion. It is not exhaustion. It is not exhaustion in any sense in which I recognize it. It is closing the courthouse doors unless they can force them open having tried every other forum that anyone can think of, right? They have to go back and do the various sort of exhaustion procedurally that substantively international law doesn't require them to. That's what Judge Pillard was asking. Substantively international law doesn't require you to go back to the genocide perpetrator and ask them to pay first. But now we're saying as a matter of procedure, even though Congress didn't write it anywhere in the text of the FSIA, we're supposed to superimpose that and say you only get to pry this door open after you have gone back to the perpetrators first. Well, and if their path to remedy in Hungary is unreasonably or arbitrarily barred, then the doors of the United States courts do remain open. I get that, but it's presumably so on the front end, the forum and inconvenience and prudential exhaustion of utility requirements going to do that analysis. So the only way they're going to get to come back here, who knows how much longer down the road, is if they've got an argument and they're asking us to write an opinion deciding that the Hungarian courts, we sit and review of the Hungarian court process and say it wasn't good enough. Now, that's where I want to get back to my political brand, but the only way it's not going to be raised judicata is if we say the Hungarian courts did a terrible job here. We would have to say they did not give them fair process or something went wrong in the process. And that's where I don't understand how we can write into the FSIA this very extraordinary intrusion on international affairs that would put this court in the position of reviewing, grading the homework of the Hungarian courts after the fact. Can we write that in and assume we can do that on our own? Judge, whatever intrusion or international friction might result from this court saying that another court's judicial process was unreasonable, there would be a much greater intrusion and potential for friction for this court to impose potentially massive liability on a foreign sovereign for events that, while yes, unbelievably horrific, happened decades ago, where plaintiffs here seek remedies that proportionate to the Hungarian economy. So the Hungarian government is going to get that upset when U.S. citizens get compensated in U.S. courts for a genocidal taking? This is a worldwide class. Would your position be the same if it was just the U.S. plaintiffs? I think if it was a U.S. plaintiff who felt the injury in the United States at the time of the taking, as in, for example, the— No, okay, so that's a very—you're getting way more nuanced than I am. What I'm asking is, if the only identified or named plaintiffs in this case were U.S. citizens, would your position be different? I think there would—in that case, I think the ground for exhaustion would still be strong, not as strong as— No, I'm talking about how affronted Hungary is going to be that our courts provide a remedy. Well, I think if you had former U.S. citizens or the descendants of people who had suffered a wrong at the United States hands in the United States borders, and some of those people moved to another country, pick your country, sought a remedy there, and that foreign court imposed very substantial damages on the United States, would that create a comedy issue? Yeah, I think it would. So what—just backing up— what are the remedies available to these plaintiffs in Hungary, and when did they become available? So there's kind of two categories of remedies that are discussed in Dr. Sanovan's declaration. One of them has to do with the kinds of claims that these plaintiffs could bring now. The other one has to do with other attempts and remedies provided by Hungary to provide compensation for these injuries, even though some of those processes are no longer available. So I understood your question to be about what kinds of claims could they assert now. What Dr. Sanovan discusses there are unjust enrichment-type claims. These would be under Hungarian law, of course, but they would be—he describes them as like unjust enrichment-type claims, property claims, contractual damages, extra contractual damages. So, you know, things that you'd have to translate from Hungarian law to U.S. law, but I think they're not so different from the kinds of legal claims that we have seen. Does Hungary agree that current law will apply and not the law that existed at the time of these takings? I think, again, I don't know under Hungarian law exactly what law would apply. I do think it would be a question under Hungarian law. So if there's a question—so if it's not at all settled whether they would apply the law that existed in Hungary at the time, if one option is that the law that would be applied would be the law that existed in Hungary at the time of the genocide, is that better? I'm sorry. If what Your Honor is asking is would Hungary say, well, you know, although these are like the worst things anyone could ever do at the time they were done under some kind of legal process and therefore these takings are legal, no, that's not going to be the position. And, in fact— I'm sorry. I have just a much more particular question. In the process of holding that the plaintiffs hadn't shown that exhaustion in Hungary would be futile, the district court so found that the plaintiffs hadn't met their burden to show that it would be futile to go to Hungary. And then in assessing the form of nonconvenience in which the burden is on your clients— Defendants, correct. —she cross-referred to the lack of a showing that there was any futility and arguably that failed to properly account for the proof burden. Am I right about that? No, she did account for the proof burden, and that's clear for two reasons. First of all, if you look a page or two earlier, the district court specifically states that the defendants bear the burden of proof for form nonconvenience. So there's no doubt that she knows who's carrying the burden. But did she cash it out? She did cash it out. When you look at the actual analysis that she made for both futility and for adequate and available forum, that analysis begins with defendant's evidence. And the evidence that defendants submitted on this point is extremely extensive. It talks about basic protections under Hungarian's basic law. It talks about amenability to process. It talks about the independence of the judiciary, the kinds of claims that could be brought, remedies that have already been provided in Hungary, including $38 million in compensation vouchers for property claims, $178 million for loss-of-life claims, another $14 million given to a Jewish foundation. It talks about the enforceability of international law. It talks about recent claims by Holocaust survivors in Hungary that were successful and that did recover lost property. So there is a great deal of evidence by defendants that the district court cited and relied on. It then looked at Mr. Hanek's declaration submitted by plaintiffs and other evidence, and it asked whether that shows that nonetheless the Hungarian forum would not be adequate and available, and she found that it doesn't. So she applied the right analysis, including relying extensively on defendants' evidence. It's not a case where she said, you know, gee, these two sides are in equipoise, but the tie goes to the runner, so I'm going to find that the plaintiffs have not met their burden here. And in terms of – oh, go ahead. Just back to exhaustion for a second. Yes. My instinct is that exhaustion and immunity are very different, but the other side has this pretty good argument that here they may not be so different to the extent that when you go to Hungary, unless something really strange happens in the Hungarian courts, that adjudication will have race judicata effect such that these plaintiffs won't be able to come back here or go anywhere else. And so the upshot is they never get to come back here. That starts to maybe look more like an immunity concept than like an exhaustion concept. It's just like a forum non-convenience dismissal. It may be that those claims never return to the United States, but it doesn't make a forum non-convent – an FNC dismissal tantamount to immunity any more than it makes this exhaustion. No, but FNC has tougher requirements for you to meet, right? The burden is different. But as to your question of isn't this like immunity? Our burden is different, and you have to show a lot of things. You have to show that the center of gravity of the litigation is over there. And we think that you did show that. I get that. But I think, look, to your point, the thing about the immunity that is defined by the FSIA, it is immunity that applies in every case and is jurisdictional and non-discretionary, meaning that when you have it – and, by the way, we still do argue that we have it. The district court never reached that issue. But if you have it, it means that the federal courts cannot touch the foreign sovereign on this case ever under any circumstances. Even at the strongest iteration of the exhaustion doctrine that we're discussing here, it is a discretionary doctrine that depends on the facts of a particular case when the comedy – if we check here and you plead race judicata, how do we get around that? You would apply preclusion principles, and if we win, we win, and if they win, they win. So it may be – That sort of makes it seem more like an immunity. The result – I agree with you to this extent, Justice Katz. The result of the exhaustion dismissal may be that they never have their claims litigated on the merits in the United States courts. But that's true of any kind of dismissal, FNC or any other kind. No, no, no. Not an international forum. Exactly. That's the whole point, right? I mean, that's the Dodd brief. That's – an international forum doesn't recognize race judicata. Preclusion. Yeah, and that's the principle forum in which this doctrine is alive and kicking. Fair enough. Again, I think where the – where comedy – excuse me – where comedy directs that another court or another sovereign has a stronger interest in adjudicating the controversy, what it means is that other sovereign has the right to adjudicate the controversy in its courts under the framework of its own laws. To say, well, we under – even where there is a comedy interest in allowing that, yeah, we're going to let you make the decision, but then we're going to ignore it in every case doesn't necessarily give effect to the comedy interest that direct exhaustion in the first place. And I think – Is this exhaustion principle – I don't even think we should call it exhaustion, but I'll do that for now. Does your exhaustion theory – has it – other than the South Circuit, has it ever been applied to cases of genocide or is it applied in other kinds of commercial disputes and things like that? Does it apply – has it ever been applied by anyone in an international tribunal or anywhere in genocide cases? Yes, so in the Ongaro-Benagas case in the 11th Circuit, international comedy was the basis for an exhaustion dismissal for World War II-era cases involving Holocaust assets like this one. Now, that was not – I think Mr. Gasson said it had not been applied in an FSIA case, and that's correct because the defendants in that case were private entities. But as Judge Katz has said earlier, if anything, the comedy interests are even stronger when the United States hails a co-equal sovereign into its courts and takes money out of the public fist. Well, it might be, but the difference is, of course, that Congress has already made a comedy judgment in the FSIA that you didn't have in that case. That's what I'm struggling with. I think our response there, and I think Judge Katz has mentioned it earlier, is that the judgment that Congress made about comedy in the FSIA is a judgment about immunity. It doesn't cash out any comedy interest. But it goes beyond a judgment about immunity. I mean, it's a fundamental judgment about how we're going to treat acts as whether they're sovereign acts or whether they're the commercial acts of a sovereign. And to the extent that they're commercial acts of a sovereign, the theory that the FSIA codifies is that sovereign for those types of functions is no longer entitled to the immunity. And in a way, you're bringing it back in by saying, but we still have to recognize that it's a sovereign and therefore give it the comedy-based immunity or exhaustion that you're advocating. No? So, not exactly, Judge Pillard. So, again, comedy-based exhaustion has been applied not only to sovereigns by the Seventh Circuit in Fisher, but to non-sovereign private defendants in other cases. Obviously, those aren't FSIA cases, because the FSIA applies only to sovereigns. But in Rio Tinto, in Ungaro-Vanagas, there are other international comedy documents, too. There's the foreign- Ungaro's and ATS case. I believe it was ATS, yeah. And there we don't have the – I mean, that's just a bare tort claim. So, there's very different arguments for taking account of – but I get your point, which is the theoretical point, which is what I was asking you. So, I see that that's a responsive answer, because you're saying, well, even where an entity is being sued qua commercial actor, the courts have looked at it. And remember that comedy and reciprocity go hand-in-hand. Comedy, reciprocity, what? And reciprocity go hand-in-hand. And so, what the Supreme Court said in Kiabel, which was an ATS case, is, look, if you – if our courts can hail foreign corporations into our jurisdiction and impose liability on them for acts that they did to foreigners on foreign soil, then other courts will do the same to us. And the court made a very similar point about foreign sovereigns in the Venezuela v. Helmer case that was decided just last term, which came out of this court. It said, look, if we embroil other sovereigns in expensive, time-consuming litigation, they will do the same to us. And so, that's the question. You know, the comedy interest is ultimately a reciprocity interest. And, you know, if the – yes, these were – events are, you know, horrible beyond imagination. You know, they occurred 70 years ago in Hungary against Hungarians. And the question is, can another court, another country's courts, correct historical wrongs that occurred in the United States to American nationals in prior generations and impose remedies that if the plaintiffs get – Of course, Hungary's had 70 years to compensate these plaintiffs and hasn't. Nothing stops Hungary from addressing their claims on its own while they're litigating here. So, Your Honor, in 1992, Hungary enacted the Second Compensation Act, which, again, resulted in $38 million paid out to claimants. It then enacted – How many claimants? There were 61,000, I believe, that were – whose claims were recognized, about 70,000 who submitted claims. That was for property loss. Then it enacted – Nothing about doing litigation here would stop that, would it? Well, I think these plaintiffs would pursue these claims in the United States courts irrespective of the compensation that has already been provided by Hungary and whatever other compensation could be. These claims are – if the plaintiffs' claims go forward and if there's jurisdiction, they're going to seek a recovery from the United States courts. And whatever else happens, I think, you know, happens. But I don't think that the plaintiffs are here saying, well, you know, we're going to sue unless – Because you keep talking about 70 years ago, and that's – I mean, there's 70 years. Hungary has had to give them what they consider adequate compensation. Fair enough, Your Honor. I think, you know, to your point about, well, is it – can you ask these plaintiffs to return to Hungary, the place where these horrible things happened to them? The fact that it happened, you know, it was – 70 – over 70 years ago, you had the fascist Hungarian regime. Then you had the communist Hungarian regime. Then you had, you know, a more open government. Hungary is a member of the United Nations. It's a member of the European Union. I think we should be reluctant to say that another country's courts, because it committed a past wrong, are somehow permanently unavailable or inadequate to address their own conduct. Again, you know, the question is, as a matter of reciprocity, do we want another country's courts making the same judgment about the United States and imposing remedies on behalf of people who were American nationals at the time of the events they complain of, who, for one reason or another, go to another country's courts and say, you know, whatever we should have gotten from the United States, we didn't get it, or we got something, but it wasn't enough. And so, you know, you courts of Hungary or any other country in the world, you close the gap. I think, you know, in those circumstances, we would think that the first stop for the plaintiffs ought to be the United States courts. And for the same reason, the first stop for the plaintiffs in this case ought to be the courts of Hungary. Thank you very much. Thank you. Mr. Gaston, do you have any time left? No. We'll give you two minutes. Thank you. Thank you, Your Honor. One point I'd like to start out with is this question of sitting in judgment on the other states' courts. Well, I would submit that we have already done that by entering into a treaty which required Hungary to pay the exact same compensation that we are asking for here today. That was the 1947 treaty, which originally was thought to have preclusive effect against this lawsuit, but which this court held did not have such effect. Nonetheless, it did cover the same subject matter, and it did cover Hungarians who were seeking compensation from their own government, and it required that payment. So it's a prima facie indication that the United States felt and still feels, I believe, that it does have a vital interest here in seeing the rule of law carried out, even in Hungary. I'd like to also touch very briefly on this idea that whatever problem there was with the allocation of the burden of proof is essentially a harmless error. That is not the case. The record in this case contained two declarations by our expert witness on the Hungarian legal regime, Dr. Hanak, who concluded that for plaintiffs in this case, meaningful remedies are simply not available, and that because of the toxic anti-Semitic environment in Hungary, Hungarian Jews have a legitimate concern that they cannot receive a fair and unbiased hearing. In response, their expert said nothing. In fact, you would have to look at the record long and hard to find anything responding to that. I believe there is absolutely nothing. So what did the district court do? The district court, one, credited some newspaper article that was attached to Hungary's reply brief, not talking about any sort of genocidal expropriation similar to what we have here, but essentially a bailment case where some family had entrusted to a museum some of its property, and then it couldn't get it back, and this was including the property in the 1950s. So what I'm trying to make, the point I'm trying to make, Your Honor, is not so much the detail, but the fact that misallocating the burden of proof hurt us and prejudiced us severely in this case because otherwise you can't just disregard what an expert witness says. This wasn't a battle of the witnesses. This was a battle of our expert witness and nothing on the other side, and nonetheless the nothing on the other side prevailed. You've alleged a worldwide class. Do you have any rough estimate of how many class members live in the U.S., how many live in Hungary, and how many live somewhere else? Well, there are very few, if any, in Hungary. We don't believe there are too many surviving Holocaust survivors who still chose to go back to Hungary and live there. We do believe there is a locus here in the United States of a clump of important group of survivors. There are some, as the Court noted, in Canada, maybe one or two in Australia, and another clump in Israel. Not a single person, if you ask them, would ever want to go back to Hungary to seek compensation in these circumstances. We have, on the record, statements from some of our clients that they did try back in the 1990s and were treated with abuse and ridicule. But a very small number currently in Hungary. Is it fair to assume that there are more class members outside the U.S. than there are inside the U.S.? Possibly, Your Honor. I have no way of really making that determination. I know there are these clusters, and certainly the United States is one major cluster, Canada perhaps, and certainly Israel. But I doubt there are any class members. We certainly don't know of any in Hungary. Just one more question from me. To the extent your merits theory is an international one, is there any international tribunal that could hear that claim? I don't believe so, Your Honor. And is there any precedent for the domestic courts adjudicating international claims of that nature? Usually it happens in international tribunals. Well, Your Honor, once again, we are not saying that this is an international claim. You asked me earlier what law would apply, and I said general principles derived from international law. That does not mean that international law or public international law applies to our claim, and we're not claiming that. And also, if we have to go under Hungarian law, we can and will, Your Honor. That is a determination yet to be made. We have no problem with that. However, we don't think that the Hungarian law of 1945, which deprived Jews of all their rights and which allowed confiscation, should apply, of course. And that's really what we're trying to avoid. The bottom line, Your Honor, is that we believe that there's no way to justify the conclusion that defendants have met their heavy burden of showing that Hungary is the strongly preferred forum for this litigation. Accordingly, we ask that you reverse and remand with clear instructions to the district court that there is no basis for FNC dismissal. Thank you. Thanks to both counsel for excellent arguments. The case is submitted.
judges: Millett, Pillard, Katsas